The next case this morning for the 10 o'clock case, this is case number 5-16-04-34 in re  Marriage of Gaines The next case this morning for the 10 o'clock case, this is case number 5-16-04 over a period of three weeks. And every single time that he went by the house, he either saw Mr. Gatewood's truck there or saw Mr. Gatewood at the residence, either entering the residence or exiting the residence. He went there during the morning, he went there during the night time. So he went sporadically to see if Mr. Gatewood was there. And again, every time that he went there over that three week period, Mr. Gatewood was there or his truck was there. Further, during Carol's testimony, she testified to the following. She testified that she was in a continuous, exclusive relationship with Mr. Gatewood, and that began in May of 2015. That was 14 months prior to the trial date. Further, she testified she has no plans to break up with Mr. Gatewood, or does she have plans to kick him out of the house? Again, this shows that they are in a permanent, stable relationship. Further, she testified that Mr. Gatewood You're not advocating that an exclusive, stable relationship is the same as a conjugal or a cohabitative relationship, are you? I'm saying that's one of the important elements of a, you know, a defective marriage. So you're, it's an element. It's one of the elements, yes. Further, she testified that Mr. Gatewood helps pay the bills. She testified that he helps pay the grocery bills, the electric bills, utility bills, the internet and cable bills. She went on to testify that they also share household chores together. They do laundry together. I believe she testified that they each do their separate laundry. She doesn't like them messing with her laundry and vice versa, but they do other household chores, like yard work. She testified when they go to the grocery store, they don't take two, no, carts down the aisle. I mean, they take one cart, they put stuff in it together, and then one of them purchases it. Again, showing that, you know, they're acting like a married couple when it comes to finances. Also, what needs to be pointed out is Mr. Gatewood's relationship with the party's minor children. Carol testified that Mr. Gatewood goes to school events with the minor children. He'll go to lunches. He'll go to Christmas parties. He actually went to an eighth-grade graduation of the minor child, the oldest minor child. She testified that Mr. Gatewood tries to teach and guide her children. He helps her with her school projects and helps with the homework. Again, I think this is very important because I think it shows that he's got a very good relationship with the children. It's not like he's just dating her and has nothing to do with the children. He's kind of like a father figure. And at one point during the testimony, she testified that she told my client that Mr. Gatewood would make a better father than my client makes for the children. Again, it shows there's permanence, there's stability to this relationship. And in fact, they operate much like a marriage does. And one thing that I found odd is the trial court, it sounded like they were really only focused on the fact that the parties didn't have a joint bank account or that they didn't buy any joint property. There wasn't a car that was bought. I believe that when the parties are paying bills together and sharing – I mean, it sounds like most of the household bills were split between the two of them. I think they're commingled in assets. I know she focused on that and said, well, they're not commingled in assets and that paying the utility bills, that doesn't show you the fact of marriage. Again, as you pointed out, sir, there's factors to cohabitation. And I think that the commingling of assets, that's just one factor. It's one self-factor of a factor. Isn't there a difference between paying bills and commingling assets? I think you can make the analogy that the parties have – or the parties don't. Let me amend my question. Isn't there a difference between contributing to bills and commingling assets? Well, I think that can kind of be one to say because basically I think when you have two separate bank accounts and you're paying bills out of each account for the same household, it's kind of like they have a common pool of money. They're just making a distinction that it's separate bank accounts by not putting the money together. But if they put the money together, the bills would still – the same amount of money from the same two sources would be paying these bills. So I think it's kind of like commingling of assets. It's just there's a distinction of not having two names on one bank account. Do you need me to clarify or – Yes, thank you. Okay. And one of the factors that court points – so a lot of the courts point to is that they have this law to terminate a maintenance obligation when either one party has a third party living with them and that party is bringing enough money to the table that the person receiving the maintenance doesn't really need the maintenance. Or where the third party is living at the person receiving the maintenance home and the obligor is paying for the third party to live. I think that's got to be one of the reasons for the termination. Either Mr. Gatewood's not bringing enough money to the table and he's spending seven nights a week at Carol's house, then my client's actually paying for him to live there. I think that's one of the reasons the court can terminate maintenance. Or if he is paying – if Mr. Gatewood is paying enough bills, then that does affect Carol's need for maintenance. Or what if he's paying his penitentiary share of the relationship? That doesn't affect the former husband's obligation. I think that if he's paying – if Mr. Gatewood is paying for, say, three out of six bills, she doesn't – Ms. Gaines doesn't have to have as much money from my client. She doesn't have to pay, say, three out of the six bills. She doesn't have to come home with that money, so it does kind of affect her need for a certain sum of money. Well, you had used the example of, I think, paying for food. Correct. And I don't know if you got into restaurants and that type of thing, but those seem to be kind of consumption of each individual. Do you have evidence that he was lessening her burden or supporting her? No, I didn't get into – or I had a trial that wasn't an exact dollar amount. I just asked the appellee if Mr. Gatewood was contributing to household bills, and she said, yes, he was contributing to the bills I previously mentioned. So I would argue that it does lessen her need for the amount of maintenance. It does affect her need for the amount of maintenance. But if he's not paying enough, then my client would in fact be using – or Carol would in fact be using my client's maintenance to support this man. If he's there seven nights a week, he's reaping the benefit of my client's maintenance obligation. One last question. Who owned the house? Her parents owned the house. Now, there's a question of whether Ms. Gaines was unable to pay rent. She said that she was unable to pay rent when my client did not provide the maintenance for a few months. However, she was never kicked out of the house. So I don't know if there's a real obligation to pay the mortgage or pay rent to the parent. But her parents do own the house. Sir? You had indicated that seven nights a week. Was there any testimony in the record contrary to the seven nights a week? Correct. There was a testimony. Carol understands that she didn't understand the question and that the seven nights a week was sometimes, I believe, is what her testimony was. However, I brought it up at trial, and if she didn't understand the question, why did she raise an objection when I sent the request to admit? I think that was the time to do it. It seems like the trial court just ignored the answer, the admission to the request to admit. But there was testimony that she said it was sporadic and she didn't understand the question. Wasn't there also testimony from someone that he allegedly rented a room from? Correct, there was. And so presumably at times he stayed at that residence. According to the testimony of the witness. And was that to be a credibility issue for the court to determine? There was, and the court found that he was renting that place. But even if he's renting and he stays a few nights every other week, I still think that he stays at the house. He resides at the house enough to reach the level of cohabitation on a continuing, conscious basis. I mean, there's case law out there that says that a person spends every other weekend at a person receiving maintenance, that there still is cohabitation. And again, I think that's one element of it. What's that? What piece is that? It was in remarriage of a parent. It's out of the 4th District. My recollection serves me correctly. And again, I think it's in that case, they talk about a bunch of factors, six factors, including how much time the party's spending together. So I think that goes through that one factor. And I know that the courts have said to look at the totality of the circumstances. And I believe in this case, the trial court, basically they honed in on the communal facets, which I believe is a subfactor of six factors that all need to be taken into consideration. If I remember the record correctly, she was paying her parents $1,200 a month up to the point at which he was no longer paying maintenance to her, at which point she ceased paying her parents. But up to that point, her testimony was she was paying them, and I may be wrong on the figure, but about $1,200 a month. I'm sorry. I'm sorry. Yes, I'm without that. Yeah, okay. But again, I think if the court were to look at the totality of the circumstances, the fact that he is, according to her request to admit, staying there so long, and the fact that he, Mr. Gay-Wilson, has such a good relationship with the children, it's more like a stepfather role. The fact that they do split a lot of the household bills. The fact that they do work together, so they're spending every day together. The fact that in a private investigator room for a three-week period of time, he was over there every day. I don't think that's a coincidence. And again, you mentioned the credibility factor, but I still think that he has to be here. He appears to be residing at this place the majority of the time. I also don't think it should be lost that Mr. Gay-Wilson's car is registered at Carroll's residence, and it was registered, I believe, in October of 2015. There was no explanation of why it was registered there. Mr. Gay-Wilson, he didn't come to testify. He didn't say that it was there for insurance purposes, because I work in O'Fallon, Illinois, where Carroll resides, but I have a house and I run a home in Springfield. But she did testify that she was unaware of it, didn't she? She testified to that, but in the request to admit, she admitted that his car was registered there. She did? She did admit that. Okay. And the request to admit, I believe, was answered in July of 2016. So we're talking October of 2015 through 2016, his car was registered. Plus, she also testified, Carroll testified, that he receives mail there. He was receiving his divorce documents from there. I think if you're receiving divorce documents, which are very important documents, that they should go to the place where he resides most. And I don't understand why. I love Judge Keeble, and I don't understand why she just discarded the whole request to admit, saying that he resides there seven nights a week, and all the other factors that show that I believe he was staying there, or does stay there, the majority of the time. She also mentioned in her ruling about... Thank you. Thank you, counsel. You'll have an opportunity for rebuttal. If I may, without rehashing the facts, I would like to correct or clarify some of the... And you are? I'm sorry. I'm Rhonda Fiss. I represent Carroll Gaines. Thank you, counsel. I would like to clarify what the testimony actually was at trial. It was Mr. Kinney, who was the investigator hired by Scott Gaines, who actually shot holes in the theory that Mr. Gaines was living with my client on a continuous and contical basis. As the court noted in her opinion, the investigator examined a home on six different occasions only, between May 16th and June 2nd, 2016. Those were the occasions over a three-week period where he saw Mr. Gatewood's vehicle there. So there is no evidence that Mr. Gatewood was spending every night with Ms. Gaines. And, in fact, Ms. Gaines specifically said, as did the witness, the independent witness, that Mr. Gatewood would reside in Springfield, where he has his own family, including a minor child, whom he visited with often. So he paid Mr. Dauphiné, was the gentleman's name, to stay in Springfield, had his own place there, so that he could see his son. There is no permanency to the relationship, no intention of permanency to the relationship, as discussed in the Miller case. There is no— Wasn't there testimony to that effect by her? Well, there was testimony that she posted to Facebook saying she met the love of her life, that she, in fact— Wasn't there testimony that she called him her soul mate? Soul mate. Wasn't there testimony that she didn't intend to end it? It was— And wasn't there testimony that it was ongoing at the time of trial? Well, I don't mean to interrupt. Are you finished? Wasn't that all—isn't that all true that I just said? Some of that is true, as I recall. And if I'm saying it's true, I do remember some of that. I can't say I remember all of that. But I also remember her specifically saying she has no intention of becoming engaged to him. She has no intention of remarrying. She has never met the man's family. Well, counsel, isn't that why cohabitation is an alternative for termination under the statute, as opposed to marriage, when you have a situation such as this lady who says she never intends to remarry? I think that that's what the statute intends. But I believe the way the statute's been construed, particularly by the Supreme Court in Illinois in the Saffity case, just simply residing together, residing together in an intimate relationship even, does not create a de facto marriage. A de facto marriage requires a lot more. It requires an intent to behave as though you are married. And all of those factors must weigh in on that. Do you mingle accounts? Do you jointly own property? Are you suggesting that there are married people, that all married people co-mingle their accounts? I know for a fact that they don't. But I also know that they have shown there's an addition of permanence, if nothing else. They generally do things together. They generally, they don't parse at dinners, as the testimony was in this case. Ms. Gaines testified when they went out to dinner with their children. He paid for his children. She paid for hers. As far as him paying all of the utilities, there's no testimony in this record that he pays all the utilities. She said occasionally he would help out with the utilities. There's no testimony that he acts as though he owns any of the property. Her parents own that house. And I guess the most important factor that's missing here under the Presidential Case Law in the Fifth District is that Mr. Gatewood offers nothing to my client that would supplant or make unnecessary the support that she relies upon from Mr. Gaines. And that is one of the most important factors considered in Sappington and also in the progeny that this case, that this Court has issued for. If there is not a situation where the relationship, the new relationship, in other words, takes care of the recipient spouse's needs for maintenance, then that doesn't create a de facto marriage. There isn't one in existence. And otherwise, what this Court or any Court is doing is simply being moral police because the purpose of maintenance is to provide the recipient spouse with the ability to maintain the lifestyle. If it's an intimate dating relationship and the courts start playing in and there's not a de facto marriage there, basically what the courts are doing is morally policing the parties. And quite frankly, most of the time the recipient spouse is the formal client. I mean, I've been doing this 32 years and I can tell you from personal experience that that's what I've observed. So, you know, Ms. Gaines unfortunately has entered into a relationship with a married man, morally that may be reprehensible to some people, but it was eight months old whenever Mr. Gaines filed to terminate her maintenance. She hadn't even met Mr. Gaines' family. Mr. Gaines is still going through a divorce. The two of them may think they're in love, but they have taken no steps, no steps to create any kind of permanent bond, to legal accounts, to rely on each other for financial support, and the de facto marriage simply isn't there. Thank you. Thank you, Counsel. Rebuttal. Thank you, Your Honor. Just a few remarks. I asked Ms. Gaines about her intention to get married. She basically said no, never again. I'm done with the marriage. I believe she said that because she knows the law. I think she's researched it. That also shows by the fact that they don't have, you know, a shared bank account, they don't share any property together. I think it's not true when they say they're just in an intimate dating relationship. The amount of time these parties spend together, all the activities that they spend together such as, you know, grocery shopping, doing lawn work, and especially the relationship that Mr. Gatewood has with these kids, that shows that they're more than in an intimate dating relationship. I think it's odd when—I mean, it's great that if somebody's in an intimate dating relationship, they only spend so much time with, you know, their partner's children, but I think it's odd that they would go to the lengths of going to school for lunches with the kids to help with the homework, to help with school projects. I think it goes above and beyond what an intimate dating relationship is, and I think it shows that, you know, they're together. They're together for the long haul. They were together for 14 months at the date of hearing. Also, Ms. Fisk mentioned that he has a home, or Mr. Gatewood rents a house, or actually he rents a bedroom in a basement of a friend who's moved for five years, but he rents that so he can see his son. Well, every other week during his, I'm assuming, court-ordered parenting time, he brings his son where? To a foul Illinois to Ms. Gaines' residence. So when Ms. Fisk says he hasn't met his family, well, clearly he sees his son every other week. Is there any evidence in the record that contradicts what you've just said, that he spent any time with the other residents with the child? There was. Actually, I can't recall if Mr. Duffy, that was the person that he supposedly rents a room from. I don't recall if he mentioned that. I do recall that, again, in a request to admit facts, Ms. Gaines admitted that every other weekend, or almost every other weekend, Mr. Gatewood's minor child spends the weekend at her residence, and she did testify to that fact. So that's all I have. Thank you, Counselor. Thank you very much. Any questions? No. If there aren't any other questions, the Court will take the matter under advisement, as to whether this position is employed. All right. Thank you very much. Thank you, Counselor.